### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **PLAINTIFF** | ) |
| v. | ) Case No. 08 CR 325 |
| | ) Judge Joan Lefkow |
| TERRANCE SEWELL | ) |
| | ) |
| **DEFENDANT** | ) |

### MEMORANDUM IN SUPPORT OF DEFENDANT SEWELL'S MOTION TO SUPPRESS EVIDENCE SEIZED DURING SEARCH OF 900 W. GUNNERSON, UNIT 106 AND STATEMENTS MADE TO LAW ENFORCEMENT

#### Introduction

Defendant Terrance Sewell ("Mr. Sewell") has been charged with knowingly possessing with intent to distribute 5 grams or more of cocaine base in violation of 21 U.S.C. §841(a)(1)(B) and possessing a firearm after having been convicted of a felony in violation of 18 U.S.C. §922(g)[1]. The government has alleged in the indictment that both the drugs and firearm were seized on March 19, 2007. The seizure was made pursuant to a search warrant of 900 W. Gunnerson, Unit 106, Chicago, Illinois issued by a magistrate judge of this district. [Search Warrant and Affidavit attached hereto as Exhibit A].

Mr. Sewell moves to suppress the drugs and firearms allegedly seized on March 19 because the search warrant failed to properly allege a probable cause basis for the

---

[1] The firearms charge is the subject of a separate motion to dismiss on Second Amendment and Commerce Clause grounds.

search as required by the Fourth Amendment.  Instead, it recites a series of isolated

events seeking to connect Mr. Sewell to Rondell Freeman, who has been charged in

another case with leading a Gangster Disciple gang drug conspiracy of over 12 other

persons.  While Mr. Sewell was originally charged in a criminal complaint in that case,

*U.S. v. Freeman, et al*, 07 CR 0843, he was not charged in the indictment at all.  The

criminal complaint makes clear that the principal government cooperator in that case

identified all the defendants charged in the criminal complaint except Mr. Sewell,

whom the cooperator did not know. [Criminal Complaint in *U.S. v. Freeman, et al*, 07 CR

0843 at ¶15].

   The isolated instances referred to in the affidavit presented for a search warrant

at best show that Mr. Sewell and Mr. Freeman knew each other and had contact several

times over a 7 month period but there is no evidence that Mr. Sewell discussed with or

transferred to or obtained drugs from Mr. Freeman or any of his co-defendants.  Instead

there are suppositions of the agent that are not supported by particularized facts

sufficient to show probable cause.  As such, the affidavit failed to establish probable

cause.  *See Sibron v. New York*, 392 U.S. 40, 62-3 (1968) ("The inference that persons who

talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the

sort of reasonable inference required to support an intrusion by the police upon an

individual's personal security."); *Owens v. U.S.*, 387 F.3d 607 (7th Cir. 2004); *U.S. v.

McPhearson*, 469 F.3d 518, 524-25 (6th Cir. 2006).

### Allegations in the Affidavit Used to Obtain the Search Warrant

Agent Sisko's affidavit in support of the search warrant of 900 W. Gunnerson, Unit 106 in Chicago focused on the reality that he was investigating a Gangster Disciple drug conspiracy inside a Cabrini Green housing project led by Rondell Freeman. [Ex. A at ¶¶3-4, 7-11]. Much of the initial information obtained by Agent Sisko came from a CW1. [*Id.* at ¶8]. This is the same CW1 referenced in the criminal complaint in *U.S. v. Freeman, et al,* 07 CR 0843 but unlike in that document, Agent Sisko does not inform the Court that CW1 can identify and knows everyone in the conspiracy except Terrance Sewell. [Ex. A at ¶8]. Agent Sisko makes certain conclusions that Mr. Sewell is a drug supplier of Mr. Freeman and perhaps a Freeman customer and an independent distributor as well but these are suppositions not supported by the "evidence" he recounted in the affidavit.

Key components of the investigation recounted by Agent Sisko in the search warrant affidavit were wiretaps obtained through court order of Freeman's telephone and systematic 11/2 year surveillance of a condominium unit at Sheridan Shores Condominium Complex allegedly used by Freeman to mix drugs. This surveillance included agent surveillance of the outside perimeter and regular review of the building's video cameras, which were installed throughout the complex. [Ex. A at ¶¶1-5]. Freeman appeared on surveillance footage 4-5 times per week. [*Id.* at ¶15, n. 1].

During this 11/2 intensive surveillance, Mr. Sewell or his car were thought by

Agent Sisko to have visited the Sheridan Shores Condominium Complex 5 times.  For

example, on August 9, 2006, Mr. Sewell was allegedly  there and had contact with

Rondell Freeman, including allegedly taking a brief ride with him in an automobile.

[Ex. A at ¶¶16-7].  Almost a full day later, the affidavit stated that Freeman showed up

with , Seneca Williams, one of his alleged conspirators, and plans a drug transaction

with a third party, who was later intercepted by agents.  On the sole basis that Mr.

Sewell had been at the complex the day before (but without recounting that surveillance

showed that **no one** else had been there to connect with Freeman other than Seneca

Williams), Agent Sisko concluded that Mr. Sewell "**may** have supplied Freeman with

his drugs the day before." (emphasis added).

A similar allegation contended that on August 17, 2006. Agent Sisko thought that

a car appearing to that of Mr. Sewell came to complex and parked in Freeman's

designated parking spot and that Freeman leaned in the driver side door of the vehicle

where he remained momentarily.  Two hours later, when Freeman exited the complex,

he had a while plastic bag which he threw in a dumpster.  Agent Sisko stated in the

affidavit that a subsequent search of the bag revealed that it contained narcotic

paraphernalia associated with the mixing of heroin.  Agent Sisko did not say in his

affidavit that when Freeman leaned into the car that might be Mr. Sewell's car, he

obtained anything.  Nevertheless on the basis of this skeletal information, he concluded

that Mr. Sewell "**may** have supplied Freeman with the drugs." (emphasis added).  [*Id*. at

¶¶26-9].

A month later and then two weeks after that, Agent Sisko contended that Mr. Sewell's vehicle was at the condominium complex without Mr. Sewell. [*Id.*. A at ¶¶30, 32]. Three days after the last of these visits from Mr. Sewell's car, Freeman drove to the complex and then later, when leaving, discarded a plastic bag which contained drug paraphernalia typically used in mixing heroin. Somehow, but Agent Sisko did not tell us why, the October 5, 2006 visit from Mr. Sewell's car was connected to Freeman dumping the bag containing drug paraphernalia. Absent from the affidavit is any information about who else, including Freeman, was at the complex in this intervening three day period. [*Id.* at ¶¶33-5].

Despite the extensive wiretap interceptions of Freeman's calls, Agent Sisko could only find one to recount involving Mr. Sewell in his affidavit. That was a call on October 27, 2006 in which the voice of the person Agent Sisko has identified as Mr. Sewell was apparently at the Daley Center. All that was Freeman said was "[c]all when you need that, I got it for you" to which the person Agent Sisko has identified as Sewell responded affirmatively. Once again, Agent Sisko supposed from this snippet that a drug transaction was being planned although despite the extensive nature of this investigation, there was no evidence that one occurred between Freeman and Mr. Sewell in the aftermath of that conversation. [*Id* . at ¶36].

The affidavit stated that agents observed Freeman visit the 900 Gunnerson, Unit 106 apartment of Mr. Sewell on January 17, 2007 and then later followed Freeman to a parking lot the agents thought was near the home of Mr. Sewell's mother. [*Id.* at ¶39].

The next day agents saw Freeman at the Sheridan Shores complex and then saw Seneca Williams there too.  Agent Sisko contended that Williams met with someone "resembling" Mr. Sewell.  They later followed that person to 900 W. Gunnerson but apparently were not able to identify Mr. Sewell as the person they were following although the next day they stopped the vehicle they had been following and did identify Mr. Sewell. [Ex. A at ¶¶40-2].  Based on this skimpy evidence, and without recounting who else of interest visited the Sheridan Shores complex from January 17-19, 2007, Agent Sisko concluded that the plastic bag containing narcotic paraphernalia that Freeman discarded on January 19,2007 somehow came from Mr. Sewell. [*Id*. at ¶¶42-4]. There were two additional time during this surveillance that Agent Sisko believed that Mr. Sewell and someone resembling Freeman may have met and one additional time that Mr. Sewell may have gone to the Sheridan Shores complex. [*Id*. at ¶46-7, 52].

Other than recounting Mr. Sewell's criminal history, the rest of Agent Sisko's affidavit recounted two incidents in February, 2007 involving Mr. Sewell's encounters with a woman identified as Belen Trevino.  Based on skimpy allegations, Agent Sisko surmised that Mr. Sewell sold Ms. Trevino drugs even after a consensual search of her car (where the drugs were allegedly purchased) did not result in finding any. [*Id*. at ¶¶49-50].

On the basis of these allegations and informing the Court that Mr. Sewell was part of the Freeman Gangster Disciple drug conspiracy, Agent Sisko sought to a search warrant for the 900 W. Gunnerson, Unit 106 apartment of Mr. Sewell.  Nothing in this

affidavit points to a probable cause basis for granting this search warrant in this case.

## Argument

### I.     Applicable Legal Standards

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"When, as here, an affidavit is the only evidence presented to a judge to support a search warrant, 'the validity of the warrant rests solely on the strength of the affidavit.'" *U.S. v. Mykytiuk*, 402 F.3d 773, 776-76 (7th Cir. 2005) quoting *U.S. v. Peck*, 316 F.3d 754, 755-56 (7th Cir. 2003). "A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *U.S. v. Mykytiuk*, 402 F3d at 776 quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. at 239.

Such evidence requires the recitation of particularized facts in an affidavit and more than mere suppositions to support conclusions of illegal conduct. *See Owens v. U.S.*, 387 F.3d at 608; *U.S. v. Weaver*, 1372, 1377-78 (6th Cir. 1996); *U.S. v. McPhearson*, 469 F.3d at 524-25. The decision of the magistrate issuing the search warrant as to the

existence of probable cause is entitled to great deference. *U.S. v. Leon*, 468 U.S. 897, 914

(1984).

Even if probable cause is lacking, evidence may not be suppressed unless Fourth

Amendment interests are advanced. Therefore, evidence will not be suppressed if the

agents acted under the good faith exception created in *U.S. v. Leon*, 468 U.S. 897. In

interpreting that case, the Seventh Circuit said in *U.S. v. Garcia*, 528 F.3d 481, 486-87 (7th

Cir. 2008):

> In *Leon*, the Supreme Court held that evidence seized pursuant to a
> subsequently invalidated search warrant need not be suppressed if the
> officers relied in good faith on the judge's decision to issue the warrant. Id.
> at 924. An officer's decision to obtain a warrant is *prima facie* evidence that
> he was acting in good faith. *United States v. Otero*, 495 F.3d 393, 398 (7th
> Cir.2007), cert. denied, --- U.S. ----, 128 S.Ct. 425, 169 L.Ed.2d 298 (2007). A
> defendant can rebut this presumption by showing that (1) the judge
> issuing the warrant abandoned his detached and neutral role; (2) the
> officer was dishonest or reckless in preparing the affidavit; or (3) the
> warrant was so lacking in probable cause that the officer's belief in its
> existence was entirely unreasonable.

When the search warrant was issued based on an affidavit that failed to show

probable cause and the good faith exception does not apply, evidence that is either the

direct or indirect product of an illegal search or seizure must be suppressed. *Wong Sun*

*v. U.S.*, 371 U.S. 484, 486 (1963).

II.    Agent Sisko's Affidavit Lacked Probable Cause to Support the Issuance of a
       Search Warrant to Search Mr. Sewell's Residence

As described above, Agent Sisko recounts a series of isolated incidents

over a six month period in a then attempt to link Mr. Sewell to the alleged Freeman

Gangster Disciple drug conspiracy and support of search of 900 W. Gunnerson, Unit

106.  The problem with the affidavit is not that it is the stock fill-in-the-blanks bare bones statement that recounts criminal activity like the one criticized in U.S. v. Garcia, 528 F.3d at 486 or the bare bones paragraph that recounts a drug buy but contains no corroboration like the one criticized in Owens v. U.S., 387 F.3d at 608.

It suffers from exactly the opposite kind of problem.  Agent Sisko's affidavit is filled with specific facts but none of them amount to anything that shows criminal activity by Mr. Sewell.  Certainly there are allegations that he knows Mr. Freeman but knowing him and visiting him do not amount to an indication of criminal activity given the extent of the monitoring and surveillance that took place here. No drugs were obtained.  No packages were seen exchanging hands.  There was one conversation between them that was recounted and that conversation, given the lack of corroboration of later activity, can hardly be interpreted as communications about drug distribution.  That is why at the end of the description of each of these incidents, we have the surmised conclusion of "I believe" or "resembling Mr. Sewell."

This is an affidavit of great detail but no substance.  As such it does not show probable cause to support the issuance of a search warrant consistent with the Fourth Amendment principles described above.  See *Sibron v. New York,* 392 U.S. at 62-3; *U.S. v. McPhearson*, 469 F.3d at 524-25; *Owens v. U.S.,* 387 F.3d at 608.

III.    The Good Faith Exception Does Not Prevent Suppression in this Case

As stated above, evidence obtained on the basis of a search warrant issued without probable cause will not be suppressed if it falls within the Leon good faith

exception rule.  To rebut the *prima facie* evidence that an officer, who obtains a search warrant was acting in good faith, Mr. Sewell must show that (1) the judge issuing the warrant abandoned his detached and neutral role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer's belief in its existence was entirely unreasonable.  *U.S. v. Garcia*, 528 F.3d at 486-87.

There is no basis for arguing the first issue.  As for the second issue, the basis for such a claim is not that Agent Sisko told bald-faced lies but rather that he failed to disclose key information, like the only one in the alleged conspiracy that CW1 did not know or could not identify was Mr. Sewell.  With respect to the conclusions that after days had elapsed after a visit from Mr. Sewell an agent dumpster pull that resulted in drug paraphernalia being found tied him to the distribution of drugs was disingenuous without any information about who visited the Sheridan Shores complex during the intervening period.

Finally, based on the case law cited above, the warrant was so lacking in probable cause that the officer's belief in it was entirely unreasonable.  See *Sibron v. New York*, 392 U.S. at 62-3; *U.S. v. McPhearson*, 469 F.3d at 524-25; *Owens v. U.S.*, 387 F.3d at 608.  In combination with the lack of disclosure of certain information cited above, the utter failure of the affidavit to show probable cause supports a rejection of the good faith exception.  Agents and local police officers will be deterred by the suppression of evidence when evidence they have seized is suppressed because their

underlying affidavits to obtain search warrants contained a litany of non-probative facts and they failed to disclose other facts that undercut their suppositions used to obtain the warrant.  U.S. v. Leon, 468 U.S. at 918-20.

Conclusion

For the reasons stated herein, Mr. Sewell asks this Court to grant his motion and suppress evidence seized in a search of 900 W. Gunnerson, Unit 106 in Chicago, Illinois on March 19, 2007 and any statements he made to authorities as a result of such seizure.

Respectfully submitted,

s/Steven Saltzman
Attorney for Defendant Sewell

Steven Saltzman
122 South Michigan Avenue, Ste. 1850
Chicago, Illinois   60603
(312) 427-4500
Date: August 7, 2008

**PROOF OF SERVICE**

I,  Steven Saltzman, an attorney hereby certifies that  on August 7, 2008 in accordance with the Fed.Crim.P. 49, Fed.R.Civ.P.5 and LR5.5, and the General Order on Electronic Case Filing (ECF), the above stated Memorandum was served pursuant to the district court's ECF system as to ECF filers.

s/Steven Saltzman

Steven Saltzman
122 S. Michigan Ave., Ste 1850
Chicago, IL  60603
312-427-4500

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
                    PLAINTIFF           )
          v.                            )
                                        )   Case No. 08 CR 325
TERRANCE SEWELL                         )   Judge Joan Lefkow
                                        )
                    DEFENDANT           )
                                        )

EXHIBIT A IN SUPPORT OF DEEENDANT SEWELL'S
MOTION TO SUPPRESS EVIDENCE

AUSA RACHEL M. CANNON (312) 353-5357

AO 106 (REV. 7/87) Search Warrant

# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF_____ ILLINOIS,    EASTERN DIVISION

In the Matter of the Search of

900 West Gunnison, Unit 106
Chicago, Illinois

## SEARCH WARRANT

**CASE NUMBER:** 0 7 M1 12

## UNDER SEAL

TO: Special Agent Jeffrey Sisto, Bureau of Alcohol, Tobacco, Firearms and Explosives, and any Authorized Officer of the United States. Affidavit(s) having been made before me by Jeffrey Sisto, who has reason to believe that ___on the person of or _x_ on the premises known as

**See Attachment A.**

In the _____ Northern _____ District of ___ Illinois,    Eastern Division, _____there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment B.**

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ March 26, 2007 _____
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property seized and promptly return this warrant to
_____ Magistrate Judge Jeffrey Cole as required by law.
U. S. Judge or Magistrate Judge

March 16, 2007  at  252 pm
Date            Time

JEFFREY COLE, MAGISTRATE JUDGE
Name & Title of Judicial Officer

CHICAGO, IL _____
City and State

Signature of Judicial Officer

AO 93 (Rev. 5/85) Search Warrant

# RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

# CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____    _____

U.S. Judge or Magistrate    Date

SW_001_00010

Attachment A

Premises to be Searched – 900 W. Gunnison, Unit 106, Chicago, Illinois

900 West Gunnison, Unit 106, Chicago, Illinois, is a 1st floor apartment unit in a multi-unit apartment building, located on the north side of Gunnison Avenue and west of Marine Avenue. The numbers 900 are attached to the building's yellow brick facade and positioned to the right of its south entrance. Unit 106 is located on the 1st floor, and is the furthest unit to the north. The numbers 106 are affixed directly to the outside of the door.

Attachment B

Items to be Seized

The items to be seized consist of the following:

(A) Cocaine, cocaine base, heroin, marijuana or any other illegal drug observed within the premises.

(B) Drug paraphernalia, including scales, plastic bags, latex gloves, mixing devices and utensils, and cutting agents.

(C) Books, ledgers, notes, photographs, and other paper records detailing gang membership, gang hierarchy, gang by-laws, gang meetings, gang dues, the amount and types of firearms and narcotics possessed, and the amount of money that the gang has at its disposal.

(D) Books, ledgers, notes, receipts, lists, and other paper records relating to the transportation, ordering, storage, sale, and distribution of firearms and narcotics.

(E) Financial books, records, lists, receipts, bank and savings and loan records of deposits, statements, and other bank records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, computer and software records containing financial data and information related to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture.

(F) Cell phone and pager records, as well as any cell phones and pagers, including the contents thereof.

(G) Any firearms, ammunition, and weapons-related gear, such as holsters and bullet-proof vests.

(H) Indicia of ownership, occupancy or residency of the premises being searched or other premises owned, rented, or utilized by SEWELL, including utility and telephone bills, lease agreements, mortgage records, loan documents, service, remodeling and repair contracts.

(I) United States currency, precious metals, jewelry, and financial instruments.

AD 106 (REV.7/87) Affidavit for Search Warrant                    AUSA RACHEL M. CANNON  (312) 353-5357

# UNITED STATES DISTRICT COURT

_____NORTHERN_____    DISTRICT OF_____ILLINOIS~~RECEIVED~~DIVISION

In the Matter of the Search of

900 West Gunnison, Unit 106
Chicago, Illinois

MAR 1 6 2007

**APPLICATION AND AFFIDAVIT**
MAGISTRATE JUDGE JEFFREY COLE
UNITED STATES DISTRICT COURT
**FOR SEARCH WARRANT**

**CASE NUMBER:**

UNDER SEAL **0 7 M1 12**

I, Jeffrey Sisto, being duly sworn, depose and say:  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives and have reason to believe that _____ on the person of or __x__ on premises known as (name, description and/or location).

### See Attachment A.

In the _____Northern_____ District of _____Illinois,    Eastern Division._____there is now concealed a certain person or property, namely (describe the person or property to be seized)

### See Attachment B.

which is (state one or more basis for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure) PROPERTY THAT CONSTITUTES EVIDENCE, FRUITS, OR INSTRUMENTALITIES OF THE COMMISSION OF A CRIMINAL OFFENSE.

concerning a violation of Title __21__ United States Code, Sections __841(a)(1), 843(b), and 846.  The facts to support a finding of Probable Cause are as follows.

### See Attached Affidavit.

Continued on the attached sheet and made a part hereof: _x_ Yes ___ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

_March 16, 2007___    at
Date

CHICAGO IL_____
City and State

_JEFFREY COLE, MAGISTRATE JUDGE_
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS    )                       **UNDER SEAL**

                           )     SS

COUNTY OF COOK     )

## AFFIDAVIT

## I. INTRODUCTION

I, Jeffrey Sisto, being duly sworn on oath, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed for approximately eight years. Prior to joining ATF, I worked as border patrol agent for the Immigration and Naturalization Service (now known as B.I.C.E.) for approximately three years. As an ATF Agent, I have received training in the enforcement of federal drug and firearms trafficking laws. In addition, I have personally conducted or assisted in several investigations involving surveillances, undercover drug purchases, controlled drug purchases with informants, arrests, pen registers, and court-authorized interception of wire and electronic communications. I have also worked as a wiretap monitor on federal investigations employing court-authorized interception of wire and electronic communications. Based upon my training and experience, I am familiar with the methods and operations used by street gangs and narcotic drug trafficking organizations to acquire and distribute narcotic drugs and other controlled substances and to conceal their illegal activities.

2. I have participated in the preparation of affidavits for search and/or seizure warrants and in the execution of numerous search and seizure warrants in connection with drug, gang, and gun investigations. Those warrants involved searches of targets' residences, garages, vehicles and storage units. Materials searched for and recovered at those locations included illegal drugs, drug paraphernalia, firearms, records relating to illegal drug trafficking and the expenditure of profits from

1

drug trafficking, currency, assets purchased with the proceeds from drug trafficking, and various materials, including photographs, showing the connection between gang members and/or members of drug trafficking organizations and their associates.

3. I am a Law Enforcement Officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

4. Through my training and experience and my discussions with other experienced law enforcement officers, I am familiar with the methods, schemes, and operations used by gang members involved in narcotics trafficking. Consequently, I know the following:

a.   That gang members commonly place assets in names other than their own to avoid detection of these assets by government agencies.

b.   That even though such assets are in other people's names, gang members continue to use the assets and exercise dominion and control over them.

c.   That gang members often keep the names and phone numbers of others in their organization in apartments that they control. These lists may contain the actual names and/or aliases of other gang members, as well as their positions within the organization.

d.   That gang members often keep books, ledgers, and manifestos detailing gang hierarchy, gang by-laws, gang member attendance at meetings, dues paid to the organization by individual gang members, lists of the amount and types of firearms and narcotics currently possessed by the gang as a whole, and the total amount of money that the gang has at its disposal for purchasing illegal contraband such as firearms and narcotics in apartments that they control.

e.   That gang members involved in narcotics trafficking often maintain records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, storage, and distribution of controlled substances, even though such documents may be in code. In addition, I know that gang members commonly "front" drugs (i.e. provide drugs on consignment) to other members, and need to keep the aforementioned records to keep track of the amounts of drugs that have been "fronted." I also know that the aforementioned records, receipts, notes, ledgers, etc., are commonly

2

SW_001_00015

maintained where gang members have ready access to them, i.e. in their residences, apartments that they control, garages, storage lockers, and cars.

f.      That it is common for gang members to secret contraband, records of drug transactions, drug sources, and drug customers in secure locations within their residences or areas that they control for ready access, and also to conceal such items from law enforcement authorities.

g.      That gang members frequently take or cause to be taken photographs of themselves, their fellow members, their property, and their guns/drugs, and that these gang members usually maintain these photographs in their residences or areas they control.

h.      That gang members involved in narcotics trafficking usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics. This paraphernalia includes, but is not limited to, scales, plastic bags, latex gloves, mixing devices and utensils, and cutting agents, such as Dormin or Sleepinal pills.

i.      That gang members involved in narcotics trafficking often possess firearms in their residences so as to protect themselves against rival gang members and others who may be interested in robbing them of the large amounts of United States currency needed to maintain and finance their ongoing drug business.

j.      That gang members involved in narcotics trafficking sometimes store documents and records relating to their drug suppliers, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of drug trafficking and money laundering crimes.

k.      That courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances.

The following information is based upon my participation in an investigation targeting the Gangster Disciples street gang ("GD"), and more specifically, a faction of the GDs operating inside the Cabrini Green housing project in Chicago, Illinois. This Affidavit is being submitted for the limited purpose of establishing probable cause to search the premises described below. Accordingly, I have not included each and every fact known to me concerning this investigation.

3

## II. PREMISES TO BE SEARCHED

5. This Affidavit is made in support of an application for a search warrant to search the premises, more fully described in Attachment A, located at 900 West Gunnison Avenue, Unit 106, Chicago, Illinois, which is a 1st floor apartment unit. There is probable cause to believe that this apartment unit is used by TERRANCE SEWELL to store the items listed in section III, *infra*.

## III. ITEMS TO BE SEIZED

6. The items to be searched for consist of the following:

(A) Cocaine, cocaine base, heroin, marijuana or any other illegal drug observed within the premises.

(B) Drug paraphernalia, including scales, plastic bags, latex gloves, mixing devices and utensils, and cutting agents.

(C) Books, ledgers, notes, photographs, and other paper records detailing gang membership, gang hierarchy, gang by-laws, gang meetings, gang dues, the amount and types of firearms and narcotics possessed by gang members and others, and the amount of money that the gang has at its disposal.

(D) Books, ledgers, notes, receipts, lists, and other paper records relating to the transportation, ordering, storage, sale, and distribution of firearms and narcotics.

(E) Financial books, records, lists, receipts, bank and savings and loan records of deposits, statements, and other bank records, letters of credit, money orders, cashier's checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, computer and software records containing financial data and information related to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture.

(F) Cell phone and pager records, as well as any cell phones and pagers, including the contents thereof.

4

(G)     Any firearms, ammunition, and weapons-related gear, such as holsters and bullet-proof vests.[1]

(H)     Indicia of ownership, occupancy or residency of the premises being searched or other premises owned, rented, or utilized by SEWELL, including utility and telephone bills, lease agreements, mortgage records, loan documents, and service, remodeling and repair contracts.

(I)     United States currency, precious metals, jewelry, and financial instruments.

## IV. PROBABLE CAUSE

### A.     BACKGROUND OF THE CURRENT INVESTIGATION

7.  This investigation focuses on of the GDs in Cabrini Green, and more specifically, the criminal organization run by RONDELL FREEMAN, which is involved in the distribution of cocaine, cocaine base in the form of "crack cocaine," heroin, and marijuana in the Chicago, Illinois area, and has been for the past several years. Information obtained during this investigation has been gathered from several sources, including interviews of other law enforcement officers and/or reviews of their reports; reviews of criminal history information maintained on law enforcement databases; reviews of drug laboratory analysis reports; reviews of intercepted wire and oral communications, as well as intercepted visual non-verbal conduct and activities, pursuant to Title III court authorizations; reviews of phone records and pen-register and trap-and-trace data obtained via court order; interviews with cooperating witnesses and confidential sources; controlled deliveries of narcotics; and numerous surveillances. This information has revealed that FREEMAN is a Gangster Disciple who controls much of the drug-trafficking in the 1230 N. Burling Building at Cabrini Green.

---

[1]  As outlined below in paragraphs 53-55, I have reviewed National Crime Information Center, Illinois State Police and Chicago Police Department (CPD) criminal history records for TERRANCE SEWELL and have learned that SEWELL cannot legally possess a firearm or ammunition because he is a convicted felon.

5

## B. RONDELL FREEMAN'S CONTROL OF THE 1230 N. BURLING BUILDING

8.  I have learned through a Cooperating Witness (CW1)[2] and Eighteenth District CPD

tactical officers that RONDELL FREEMAN and his co-conspirators distribute crack cocaine, heroin,

and cannabis in and around the area of the Cabrini Green housing projects in Chicago, Illinois. CW1

and CPD tactical officers from the Eighteenth District (where Cabrini Green is located) have

reported that FREEMAN controls the narcotics distribution in the 1230 N. Burling building at

Cabrini Green. CW1 and these CPD officers have reported that FREEMAN's organization in the

1230 N. Burling building includes at least 11 members, when including FREEMAN. According to

CW1 and these CPD officers, FREEMAN himself does not typically sell drugs in the building, but

supplies the drugs and employs others to do so for him. For example, CW1 and these CPD officers

have reported that FREEMAN employs several "servers" in the 1230 building, meaning they sell

"nickel" ($5) and "dime" ($10) bags of crack cocaine or heroin for him. CW1 and these CPD

officers report that FREEMAN also has several building "overseers," meaning individuals who

typically manage the day-to-day operations of the building, act as security, and collect money for the

organization. CW1 and these CPD officers have reported that the organization's drug sales occur

in the southernmost stairwell of the 1230 N. Burling building, usually on floors 6 through 10. As

further corroboration, CW1 has made a total of 3 controlled purchases of narcotics to date in the

---

[2] CW1 has been arrested approximately 21 times for various offenses, and has three prior drug possession convictions for which s/he served time in Illinois state correctional institutions. CW1 has provided information to law enforcement officers in the past that has proven reliable and has led to the arrest of several persons for controlled substance violations. CW1 was opened as a cooperating witness with ATF in June of 2005. Although s/he is cooperating in an effort to work off a federal crack cocaine charge, no promises have been made to CW1 about whether s/he will ultimately be charged, and/or about what sentence s/he may receive. Information provided by CW1 in this investigation has been corroborated by phone records, consensually-recorded conversations, recorded narcotics purchases, surveillances, and trash pulls. CW1 has been paid approximately $300 for operational services and information.

SW_001_00019

1230 N. Burling building (on September 8, 2005, November 1, 2005, and November 2, 2006), during which he purchased a total of approximately 37 baggies of crack cocaine.

9. Based on the evidence outlined below, ATF agents believe that TERRENCE SEWELL may be one of FREEMAN's drug suppliers. In addition, it appears that SEWELL may also be selling drugs on his own, and that he may receive some of the drugs from FREEMAN, thereby making him a customer as well. I have drawn these conclusions from wiretapped calls that were intercepted between FREEMAN and SEWELL, wiretapped calls between other individuals in which SEWELL was discussed, the timing of SEWELL's visits to the Sheridan Road Unit and FREEMAN's subsequent packaging of narcotics for resale, and numerous surveillances of FREEMAN and SEWELL.

## C. COURT-AUTHORIZED INTERCEPTIONS

10. From March 17, 2006 through April 15, 2006, and again from April 19, 2006 through May 18, 2006, ATF, pursuant to court authorization from the Chief Judge of this District, installed a covert camera and microphone and intercepted oral communications and visual, non-verbal conduct and activities occurring at RONDELL FREEMAN's narcotics packaging house, located at located at 5740 N. Sheridan Road, Unit 3E, Chicago, Illinois (the "Sheridan Road Unit").[3] During this time, agents observed RONDELL FREEMAN purchasing a gun in the unit, and captured RONDELL FREEMAN and others on audio and/or video preparing and packaging narcotics for sale.

11. On July 18, 2006 and August 22, 2006, Chief Judge James F. Holderman signed orders authorizing the interception of wire communications made by RONDELL FREEMAN over cellular telephone number (646) 421-1464 ("Target Phone 4"). During the government's

---

[3] The court orders permitted monitoring of solely the kitchen and living room of the unit.

SW_001_00020

interception of Target Phone 4, the government learned that RONDELL FREEMAN also utilized (407) 401-6530 ("Target Phone 6") to communicate with members of his narcotics trafficking organization. Accordingly, on October 19, 2006, Chief Judge James F. Holderman authorized the interception of wire communications occurring over Target Phone 6.[4] As described below, and as learned in part from these wiretaps, there is probable cause to believe that RONDELL FREEMAN is presently using the Sheridan Road Unit to package and store narcotics and money.

### D. RONDELL FREEMAN's USE OF THE SHERIDAN ROAD UNIT

12.    During the course of this investigation, ATF agents have learned that RONDELL FREEMAN and members of his organization frequently travel to the Sheridan Road Unit. ATF agents have surveilled, on numbers occasions, RONDELL FREEMAN entering and exiting this condominium complex. Moreover, agents have observed RONDELL FREEMAN park the cars he drives in the complex's parking lot, and specifically, within parking spot number 34.

13.    Sometime after learning that RONDELL FREEMAN routinely traveled to the Sheridan Shores Condominium Complex and parked in spot number 34, agents spoke with the condominium complex's property manager and learned that parking spot number 34 is assigned to the tenant residing in Unit 3E (the Sheridan Road Unit). Agents also learned from the property manager that the Sheridan Road Unit, which is a condominium, is registered in the name "GLORIA JACKSON." Agents have since conducted a query through Autotrack, a commercial database containing identifying information such as telephone numbers, addresses, and social security numbers, and have learned that there is one "Gloria Jackson" associated with both the Sheridan Shores Condominium Complex and the Cabrini Green public housing complex, and more

---

[4]  Agents have also wiretapped other phones as part of this investigation pursuant to court orders.

8

specifically, with the high-rise building located at 1230 N. Larrabee Street. Agents have also obtained a copy of an identification card issued by the Illinois Secretary of State on September 13, 2005 for the "Gloria Jackson" with an address of 1230 N. Larrabee St., Chicago, Illinois. CW1 has identified the woman depicted in this identification card as FREEMAN's aunt.

14.    ATF agents have obtained and reviewed records from the title company that handled the sale of the Sheridan Road Unit. Review of these records has revealed that the unit was purchased in June of 2000 for $65,000. These records further indicated that the sale was a cash transaction, and, at the time of the closing, 5 cashiers checks totaling $28,0000 were produced. Among the checks produced, none were more than $10,000, and 3 were issued on the same day by 3 different banks in the amount of $5,000 each.

### E. OVERVIEW OF SURVEILLANCE VIDEO REVIEWS AND TRASH PULLS

15.    Between September of 2005 and the present, ATF agents have regularly traveled to the Sheridan Shores Condominium Complex and conducted reviews of the complex's surveillance video.[5] My reviews have disclosed that a black male resembling RONDELL FREEMAN routinely parked the cars he drove in parking spot number 34, entered the complex through the service door, and later departed the complex within minutes to hours after his arrival. My reviews further disclosed that RONDELL FREEMAN frequently exited the complex carrying a plastic trash bag,

---

[5] On or about August 31, 2005, ATF agents met with the property manager for the Sheridan Shores Condominium Complex. During this meeting, he provided ATF agents with the keys to the complex's maintenance room and gave verbal consent to review the complex's surveillance video cameras, which are installed throughout the complex. From approximately August 31, 2005 through November 10, 2005, agents checked the complex's video approximately 2 or 3 times per week. During this time, agents focused their review on the camera that overlooks parking spot 34. On or about November 10, 2005, ATF replaced a broken camera that overlooks the complex's service door. This door separates the parking lot from the condominium complex's lobby, and allows its viewer to monitor who enters and exits this door of the complex. After ATF replaced this camera, reviewing agents were able to better identify the subjects who accompanied FREEMAN to and from the complex. From these reviews over the past several months, I have observed that, on average, a black male resembling FREEMAN appears on the surveillance footage approximately 4-5 times per week.

SW_001_00022

which he would toss into the complex's trash dumpsters. Subsequent trash pulls of the trash bags

resembling those discarded by RONDELL FREEMAN disclosed that they contained baggies with

cocaine and heroin residue, as well as other drug paraphernalia, namely, razor blades, Dormin and

Sleepinal pill packaging (narcotics cutting agents), and latex gloves. Over the course of the past 18

months, ATF has conducted 17 trash pulls in which a trash bag was recovered that contained these

types of items. On one occasion, ATF conducted a trash pull that yielded a latex glove with

FREEMAN's fingerprint on it.

### F.  TERRANCE SEWELL VISITS RONDELL FREEMAN'S NARCOTICS PACKAGING HOUSE

16.  On August 8, 2006, at approximately 7:30 PM, an agent conducting surveillance of the

Sheridan Shores Condominium Complex observed RONDELL FREEMAN and TERRANCE

SEWELL enter the complex moments after an orange Mercury Grand Marquis sedan registered to

TERRENCE SEWELL arrived in complex's southwest parking lot.[6]  The surveillance agent also

observed that the driver of Mercury sedan remained in the vehicle as FREEMAN and SEWELL

entered the complex.

17.  Approximately 90 minutes after arriving, surveillance observed RONDELL FREEMAN

and TERRANCE SEWELL exit the complex and leave the parking lot in FREEMAN's vehicle, a

Chevrolet Lumina. At approximately 9:45 PM, surveillance observed FREEMAN's Lumina return

to the parking lot with both FREEMAN and SEWELL. Around 15 minutes after their return,

surveillance agents observed the Mercury sedan registered to SEWELL depart from the complex's

---

[6] The surveillance agent, ATF Special Agent (S/A) Michael Casey, initially reported that an unidentified male black subject entered the complex with RONDELL FREEMAN. However, following the surveillance, S/A Casey advised me that he had viewed an Illinois Secretary of State digital photograph of TERRANCE SEWELL and now believes that subject to have been SEWELL.

10

parking lot.[7]  Agents followed the Mercury sedan and observed it park near 900 W. Gunnison Avenue, Chicago, the location of SEWELL's apartment (as outlined more fully herein).

G.    **RONDELL FREEMAN AND HIS ASSOCIATE PACKAGE NARCOTICS FOR RESALE APPROXIMATELY 24 HOURS AFTER TERRANCE SEWELL'S VISIT**

18. On August 9, 2006, at approximately 7:43 PM, a surveillance agent observed RONDELL FREEMAN's Chevrolet Lumina arrive at the Sheridan Shores Condominium Complex and park in the assigned parking spot for FREEMAN's condominium unit. My review of surveillance footage disclosed that, at approximately 7:48 PM, two black males resembling RONDELL FREEMAN and SENECCA WILLIAMS entered the condominium complex through the service door.[8]

19. On that same date, at 9:35 PM, ATF intercepted a two-way telephone call (Call # 5592) from Target Phone 4, a cellular telephone being used by RONDELL FREEMAN. During this call, SYBLE MCCLUTCHEY stated, "Come holler at me."[9]  Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call, MCCLUTCHEY asked FREEMAN to supply her with a package of narcotics ("Come holler at me.").

20. At 9:36 PM., ATF intercepted a two-way telephone call (Call # 5595) from Target Phone 4. During this call, SYBLE MCCLUTCHEY asked, "You heard me nigga?"  FREEMAN replied,

---

[7]  Agents were not able to clearly identify who was inside the car from their surveillance point.

[8]  WILLIAMS is a close associate of FREEMAN who helps FREEMAN package drugs for resale. CW1 has identified SENECCA WILLIAMS as a Gangster Disciples street gang member.  WILLIAMS has numerous drug-related arrests in Cabrini Green, and has been convicted of two drug felonies.  In addition, on December 2, 2005, surveillance footage captured WILLIAMS exiting the Sheridan Shores Condominium Complex carrying a white plastic garbage bag.  Approximately 6 and ½ hours later, an agent recovered the bag during a trash pull and found it to contain narcotic paraphernalia.  Moreover, on April 1, 2006, ATF intercepted WILLIAMS on audio inside RONDELL FREEMAN narcotics packaging house assisting RONDELL FREEMAN preparing crack cocaine for resale.

[9]  Based on numerous intercepted phone calls such as these that occurred during this investigation, agents believe SYBLE MCCLUTCHEY helps oversee the sale of RONDELL FREEMAN's narcotics in the 1230 N. Burling building in Cabrini Green.

11

SW_001_00024

"Yea. I'm finna be en-route." FREEMAN also asked, "You got a ride?" MCCLUTCHEY answered, "Yea." Based on my training and experience, as well as my knowledge of this investigation, I believe that in, in this call, FREEMAN informed MCCLUTCHEY that he would supply her with narcotics and would soon be meeting with her ("Yea. I'm finna be en-route.").

21. At 11:04 PM., ATF intercepted a two-way telephone call (Call # 5609) over Target Phone 4. During this call, FREEMAN stated, "...I was finna meet you." MCCLUTCHEY asked, "Where you finna meet me at?" FREEMAN answered, "Around the way." Based on my training and experience, as well as my knowledge of this investigation, I believe that, in this call, FREEMAN informed MCCLUTCHEY that he planned to meet with her ("I was finna meet you.") at a location away from Cabrini Green ("Around the way.").

22. At approximately 11:15 PM., surveillance agents observed RONDELL FREEMAN exit the Sheridan Shores Condominium complex through the service door and enter his Chevrolet Lumina. Surveillance agents followed FREEMAN as he departed the complex and drove southbound on Lake Shore Drive.

23. Minutes later, and prior to FREEMAN and MCCLUTCHEY meeting up, CPD Officers assisting in this investigation located SYBLE MCCLUTCHEY and seized United States Currency from her, the driver, and their car. The recovered money was consistent with money obtained following numerous individual narcotics sales, as it was a total of $1,601 mostly in small bills. Immediately after being released by CPD, MCCLUTCHEY spoke with FREEMAN over the telephone (Call # 5615) and alerted him of the seizure, stating, "They just stopped us. They got the mother-fucking money ... The money was under the seat ... they like, 'get back in the car and get your IDs, man,' and they just sent us all off."

12

SW_001_00025

24. Minutes after the money seizure, a surveillance agent observed RONDELL FREEMAN's Chevrolet Lumina return to the parking lot of the Sheridan Shores Condominium Complex and park in the assigned parking spot for his condominium unit.

25. Based on the arrival of RONDELL FREEMAN and SENECCA WILLIAMS to FREEMAN's narcotics packaging house, the abovementioned telephone calls, and FREEMAN and MCCLUTCHEY's intended meeting, as well as my knowledge of this investigation, I believe that FREEMAN and WILLIAMS prepared and packaged narcotics inside FREEMAN's condominium unit sometime soon after their arrival at 7:48 PM, and were bringing the drugs to MCCLUTCHEY in exchange for the cash MCCLUTCHEY had. I also believe that SEWELL may have supplied FREEMAN with his drugs the day before, for the reasons outlined more fully herein.

### H. RONDELL FREEMAN PREPARES NARCOTICS FOR RESALE WITHIN TWO HOURS AFTER THE ARRIVAL OF AN INDIVIDUAL IN TERRANCE SEWELL'S CAR

26. I have reviewed surveillance footage of the Sheridan Shores Condominium Complex for August 17, 2006. My review of this footage disclosed that, at approximately 4:51 PM, a vehicle appearing to be TERRANCE SEWELL's Mercury sedan arrived in the complex's southwest parking lot and parked in the assigned parking spot for RONDELL FREEMAN's condominium unit. Soon afterwards, a vehicle appearing to be FREEMAN's black Range Rover arrived in the parking lot and parked near the car appearing to be SEWELL's Mercury sedan.[10] The surveillance footage showed that at approximately 4:56 PM, a black male resembling RONDELL FREEMAN leaned into the driver side door of SEWELL's Mercury sedan, remained momentarily inside, leaned out, and then entered the complex through the service door.

---

[10] Agents had previously seen FREEMAN driving an identical Range Rover.

13

SW_001_00026

27. My review of the surveillance footage further disclosed that at 6:56 PM, approximately 2 hours after the arrival of TERRANCE SEWELL's Mercury sedan, RONDELL FREEMAN exited the condominium complex through the service door carrying a white plastic bag. FREEMAN then walked to the complex's trash dumpsters and discarded the bag, which landed directly under the complex's trash chute. FREEMAN then departed the in his black Range Rover.

28. Approximately 5 hours after RONDELL FREEMAN discarded the plastic bag, ATF approached the trash dumpster and found that it contained a plastic bag similar in size, color, and location to the one carried by FREEMAN. ATF recovered the bag and found it to contain narcotic paraphernalia similar to paraphernalia recovered during previous trash pulls, such as Dormin and Sleepinal pill packaging (both are narcotics cutting agents), latex gloves, and ziplock baggies.

29. Based on my review of the surveillance footage capturing a black male appearing to be RONDELL FREEMAN leaning into TERRANCE SEWELL's Mercury sedan, the narcotic paraphernalia recovered from FREEMAN's trash, as well as my knowledge of this investigation, I believe that FREEMAN packaged narcotics inside his condominium unit for resale after meeting with SEWELL. I also believe that SEWELL may have supplied FREEMAN with the drugs.

## I.    RONDELL FREEMAN EXITS HIS NARCOTICS PACKAGING HOUSE TO MEET WITH AN INDIVIDUAL IN TERRANCE SEWELL'S CAR

30. On September 19, 2006, agents conducted surveillance of the Sheridan Shores Condominium Complex. At approximately 10:34 PM, surveillance agents observed a red Oldsmobile minivan arrive in the complex's parking lot and park in the parking spot assigned to RONDELL FREEMAN's condominium unit. Agents then observed RONDELL FREEMAN exit the minivan and enter the complex through its service door. Approximately 40 minutes later, I observed TERRANCE SEWELL's Mercury sedan, occupied by two black males, arrive at the

14

complex and park in a spot located near the complex's trash dumpsters. Seconds after the sedan's arrival, I observed RONDELL FREEMAN exit the complex and walk towards the sedan. Although agents could not observe what occurred at the sedan from their vantage point, they observed that approximately 9 minutes later, SEWELL's Mercury sedan depart from the complex's parking lot.

### J.   IDENTIFICATION OF TERRANCE SEWELL'S APARTMENT

31. On September 27, 2006, ATF agents observed TERRANCE SEWELL's Mercury sedan parked on the 900 West block of Gunnison Avenue, Chicago. After locating the vehicle, agents approached the apartment complex located at 900 W. Gunnison Avenue and observed the name T. SEWELL listed on the callbox at the apartment complex. Agents also observed, after entering the common area of the apartment complex, that a mailbox for Unit 106 listed the name T. SEWELL.

### K.   AN INDIVIDUAL IN TERRANCE SEWELL'S CAR ARRIVES AT RONDELL FREEMAN'S NARCOTICS PACKAGING HOUSE

32.. I have reviewed surveillance footage of the Sheridan Shores Condominium Complex from October 5, 2006. My review of this footage disclosed that, at approximately 9:27 AM, a white coupe resembling the white Lexus coupe FREEMAN has been observed driving on numerous occasions arrived in the complex's southwest parking lot and parked in the assigned parking spot for RONDELL FREEMAN's condominium unit. Approximately 3 minutes later, a vehicle resembling TERRANCE SEWELL's Mercury sedan arrived in the parking lot and parked near the white coupe. Shortly after, a black male resembling RONDELL FREEMAN approached the drivers-side of the Mercury sedan. My review also disclosed that at approximately 10:00 AM, the Mercury sedan backed out of its parking spot and departed.

15

L.  **RONDELL FREEMAN DISCARDS NARCOTICS PACKAGING PARAPHERNALIA APPROXIMATELY THREE DAYS AFTER MEETING WITH AN INDIVIDUAL IN TERRANCE SEWELL'S CAR**

33. On October 8, 2006, agents reviewed surveillance footage from the Sheridan Shores Condominium complex. The review of this video disclosed that, at approximately 12:34 PM, a white coupe resembling FREEMAN's Lexus coupe arrived in the complex's southwest parking lot and parked in the assigned parking spot for RONDELL FREEMAN's condominium unit. A black male resembling RONDELL FREEMAN exited the coupe and walked towards the complex's service door.

34. At approximately 3:32 PM, RONDELL FREEMAN walked to the complex's trash dumpsters and discarded a plastic bag in the trash dumpster positioned directly under the complex's trash chute. Moments after discarding the plastic bag, FREEMAN departed in the white coupe that had been parking in his assigned parking spot.

35. Approximately 2 hours after RONDELL FREEMAN's departure, ATF approached the complex's trash dumpsters and found a plastic trash bag, similar in size, color, and location to the one discarded by FREEMAN earlier, resting near the top of the dumpster. ATF recovered the bag and examined its contents, finding it to contain narcotic packaging paraphernalia similar to that recovered during previous trash pulls, such as Dormin and Sleepinal pill packaging and latex gloves.

M.  **INTERCEPTED TELEPHONE CALL BETWEEN RONDELL FREEMAN AND TERRANCE SEWELL**

36. On October 27, 2006, at 2:04 PM, ATF intercepted an outgoing telephone call (Call # 6255) from Target Phone 6, a cellular telephone being used by RONDELL FREEMAN, to telephone number (773) 699-8894. During this call, FREEMAN asked, "Where you at T-MONEY?"

16

TERRANCE SEWELL responded, "I'm at the Daley Center..."[11] FREEMAN then stated, "Call when you need that. I got that for you." SEWELL replied, "Ya, alright, ok." Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN informed SEWELL that he, FREEMAN, was ready to provide SEWELL either with a package of narcotics and/or proceeds obtained from the sale of narcotics previously fronted by SEWELL ("Call when you need that. I got that for you").

### N.    INTERCEPTED TELEPHONE CALLS DISCUSSING TERRANCE SEWELL SUPPLYING DRUGS TO FREEMAN'S NARCOTICS TRAFFICKING ORGANIZATION

37.    On November 1, 2006, at 10:11 PM, ATF intercepted an incoming telephone call (Call # 7531) from Target Phone 6. During this call, FREEMAN instructed ADAM SANDERS, "Don't give them caps to nobody. T-MONEY said motherfucker dippin' out of them too...go buy some tape from across the street, scotch tape, put it around the motherfucker."[12] Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN told SANDERS that TERRANCE SEWELL informed him that individuals were tampering with capsules of heroin FREEMAN's organization was selling ("Don't give them caps to nobody. T-MONEY said motherfucker dippin out of them too."). I also believe that FREEMAN instructed SANDERS to

---

[11] TERRANCE SEWELL is believed to be the male in this call based on the following: (a) the cellular telephone utilized by the male is subscribed to TERRANCE SEWELL; (b) I have examined a digital image posted on MySpace, an Internet Web site, that depicts RONDELL FREEMAN standing next to TERRANCE SEWELL. The caption below the image states, "Me and T Money"; (c) On January 19, 2007, ATF Special Agent Delucio briefly spoke with TERRANCE SEWELL after CPD officers conducted a traffic stop of his vehicle. Minutes following the agent's discussion with SEWELL, the agent listened to this call and recognized the male's voice to be that of TERRANCE SEWELL.

[12] CW1 has identified ADAM SANDERS as a Gangster Disciple street gang member. SANDERS has numerous drug-related arrests in Cabrini Green and has been convicted of three drug felonies. CW1 has further described SANDERS as someone who oversees the sale RONDELL FREEMAN's narcotics at the 1230 N. Burling in Cabrini Green. In addition, SANDERS and FREEMAN have been intercepted in numerous wiretapped phone calls speaking with each other about SANDERS's receipt of drugs from FREEMAN. Moreover, on November 13, 2006, CPD officers recovered a package of narcotics from inside a vehicle in which SANDERS was the occupant following agents' observations of SANDERS meeting with another individual at a drug drop-off spot frequently used during the course of the investigation.

17

SW_001_00030

purchase tape and wrap it around the capsules of heroin so to prevent tampering with them ("go buy some tape from across the street, scotch tape, put it around the motherfucker.").

38. On November 3, 2006, at 7:40 PM, ATF intercepted outgoing telephone call (Call # 7762) from Target Phone 6 to ADAM SANDERS. During this call, SANDERS informed FREEMAN, "We found them....them 'dro, them capsules." FREEMAN asked, "Where they at now?" SANDERS answered, "I got them....It's almost over with. Yea, ask T-MONEY. T-MONEY came through today...so, we going to do the tape next time." FREEMAN replied, "All right." Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SANDERS informed FREEMAN that FREEMAN's underlings had located missing hydroponic marijuana and capsules of heroin ("We found them....them dro, them capsules"). I also believe that SANDERS informed FREEMAN that TERRANCE SEWELL was made aware that the hydroponic marijuana and capsules of heroin were almost all sold ("It's almost over with. Yea, ask T-MONEY."), and that SEWELL then supplied the organization with more drugs ("T-MONEY came through today."). I further believe that in this call FREEMAN's underlings were stating that they planned to tape the next supply of capsules so as to prevent tampering ("so, we going to do the tape next time.").

## O.     RONDELL FREEMAN VISITS TERRANCE SEWELL'S APARTMENT COMPLEX

39. On January 17, 2007, at approximately 8:36 PM, an agent, conducting surveillance in the area of TERRANCE SEWELL's apartment complex, observed RONDELL FREEMAN's red Oldsmobile minivan drive west on Gunnison Avenue and park in front of the apartment complex located at 900 W. Gunnison Avenue, Chicago, Illinois. The surveillance agent then observed a male black resembling RONDELL FREEMAN exit the minivan and meet with a black male near the

18

complex's entrance.    ATF then observed both individuals enter the apartment complex. Approximately an hour later, a surveillance agent observed FREEMAN exit the complex accompanied by two unknown males, enter the minivan, and drive west on Gunnison Avenue. Agents followed the minivan and observed it enter the parking lot located east of the apartment complex located at 4813 N. Winthrop, Chicago, Illinois. This address is believed to be SEWELL's mother's address for the reasons outlined in paragraph 55.

**P.    TERRANCE SEWELL VISITS RONDELL FREEMAN'S NARCOTICS PACKAGING HOUSE WHEN FREEMAN AND AN ASSOCIATE PACKAGE NARCOTICS FOR RESALE**

40.    On January 18, 2007, at approximately 7:34 PM, agents conducted surveillance of the Sheridan Shores Condominium complex. During this surveillance, an agent observed RONDELL FREEMAN's red Oldsmobile minivan arrive in the complex's southwest parking lot and park in the assigned parking spot for RONDELL FREEMAN's condominium unit. FREEMAN then entered the complex.

41.    At approximately 9:08 PM, 1½ hours after FREEMAN's arrival, surveillance observed SENECCA WILLIAMS exit the complex, through the service door, and meet with a male black resembling TERRANCE SEWELL. The surveillance agent then observed both individuals enter the complex and walk into an elevator. Approximately 10 minutes later, SEWELL exited the complex and walked out of agents' sight. Seconds later, surveillance then observed a Toyota Camry pull out of the complex's parking lot. Surveillance units followed the Toyota Camry as it drove directly to Gunnison Avenue and parked in front the apartment complex located at 900 W. Gunnison, SEWELL's residence.

42.    As agents continued to maintain surveillance, on January 19, 2007, at approximately

19

12:15 AM, agents observed the Toyota Camry depart from Gunnison Avenue. Chicago Police officers assisting in this investigation effected a traffic stop of the Camry and identified the driver as TERRANCE SEWELL.

43. On January 19, 2007, during the afternoon hours, I reviewed surveillance footage from the Sheridan Shores Condominium complex. My review disclosed that at approximately 1:55 PM a male black resembling RONDELL FREEMAN discarded a yellow plastic shopping bag into the trash dumpster located directly under the complex's trash chute. Moments later, a red minivan resembling the one in which RONDELL FREEMAN had previously been observed (see paragraphs 30, 39, and 40) departed from the lot. Approximately an hour after the minivan left, an ATF agent approached the trash dumpster and found that a plastic bag similar in size, color, and location to the one previously deposited by FREEMAN, rested at the bottom of the dumpster. The agent recovered the bag and found it to contain narcotic packaging paraphernalia similar to that recovered during previous trash pulls, such as Dormin and Sleepinal pill packaging, latex gloves, and ziplock baggies.

44. Based on RONDELL FREEMAN and SENECCA WILLIAMS presence at FREEMAN's narcotics packaging house, the narcotic paraphernalia recovered from FREEMAN's trash, as well as my knowledge of this investigation, I believe that FREEMAN and WILLIAMS prepared and packaged narcotics following TERRANCE SEWELL'S visit, and that SEWELL likely supplied them with some or all of the narcotics.

**Q.    ADDITIONAL SURVEILLANCE OF TERRANCE SEWELL AND HIS RESIDENCE**

45. On February 6-8 and 14-15, 2007, agents conducted surveillance of the apartment complex located at 900 W. Gunnison, Chicago, Illinois. During this time period, surveillance units observed TERRANCE SEWELL exit and enter the complex on several different occasions.

20

Surveillance units also observed that SEWELL often parked his car near the apartment complex's south entrance.

46. On February 6, 2007, while conducting surveillance of TERRANCE SEWELL's apartment, ATF observed a male black resembling ROBERT FREEMAN, who has been captured on audio in this case preparing what appeared to be crack cocaine with RONDELL FREEMAN, depart SEWELL's apartment complex approximately 15 minutes after he arrived.[13]

47. On February 7, 2007, at approximately 2:20 PM, surveillance units observed SEWELL exit his apartment complex and enter a yellow Pontiac coupe through the passenger side door. Surveillance followed the Pontiac as it departed from Gunnison Ave. and drove directly to the Sheridan Shores Condominium complex, RONDELL FREEMAN's narcotics packaging house.

48. On February 8, 2007, at approximately 6:40 PM, surveillance units observed SEWELL exit his apartment complex and enter the Toyota Camry he had previously (and subsequently) been seen in (see paragraphs 41, 42, 50-52). At approximately 8:30 PM, surveillance units observed SEWELL park the Camry on Gunnison Ave. and enter his apartment complex located at 900 W. Gunnison Ave., Chicago, Illinois.

49. On February 14, 2007, at approximately 12:12 PM, an agent observed SEWELL exit the passenger side of a black BMW parked in front of 900 W. Gunnison Ave. At approximately 12:26 PM, surveillance units observed the BMW park in a Walgreens lot located at 5625 N. Ridge, Chicago, IL. Surveillance units observed a white female exit the BMW and enter the Walgreens. Inside the Walgreens, an agent observed the female purchasing lighters and Visine. At

---

[13] Agents have reviewed audio recordings obtained during the authorized interception of oral communications within RONDELL FREEMAN's narcotics packaging house. Agents' review has disclosed that, on March 29, 2006, ROBERT FREEMAN assisted RONDELL FREEMAN in what sounded like the preparation of crack cocaine. Agents overheard the sounds of what appeared to be the scraping of pots and pans and conversation about preparing crack cocaine.

21

approximately 1:17 PM, surveillance units observed the BMW park in the area of 3200 N. Clark St., and the female driver exit the BMW and walk south. At approximately 1:27 PM, surveillance units observed the female purchasing unknown item(s) from the Pipes & Stuff store located at 3174 N. Clark St. Surveillance units then observed the female exit the store and leave the area in the BMW. Surveillance units followed the BMW to the area of 900 N. Michigan Ave., where a traffic stop for identification purposes was conducted. The female was then identified by her driver's license as Belen TREVINO. After receiving verbal consent from TREVINO to search her car, agents observed a bag containing two glass pipes and two packs of an unknown type of cigarette. Agents also observed the second bag containing lighters and Visine. Agents did not search TREVINO's person. Agents then ran TREVINO's information through a commercial database and saw that she had an address of 950 N. Michigan Ave., Chicago, Illinois. Based on my training and experience, as well as my knowledge of this investigation, I believe TREVINO had purchased drugs from SEWELL and was purchasing items with which to smoke the drugs (such as the pipes, lighters, etc.). I further believe that agents did not recover any drugs from TREVINO because she had likely stored them on her person (which agents did not search) following her purchase of them from SEWELL.

50. On February 15, 2007, at approximately 5:35 PM, an agent observed SEWELL exit his apartment complex at 900 W. Gunnison Ave., enter his Toyota Camry, and drive westbound. At approximately 5:50 PM, an agent observed that SEWELL had parked in the area of 5700 N. Kenmore Ave., and appeared to be talking on his cell phone. A few minutes later agents observed an unknown black male exit 1016 W. Hollywood and enter SEWELL's Camry. At approximately 6:20 PM, surveillance units observed the male exit the Camry and walk back into 1016 W.

22

Hollywood.[14]

51. At approximately 6:35 PM, agents observed Damien SEWELL enter the aforementioned Toyota Camry in the area of 4753 N. Sheridan Ave. At approximately 7:00 PM, surveillance units observed T. SEWELL and D. SEWELL park in the area of 900 W. Gunnison Ave. and enter the building. At approximately 7:45 PM, an agent observed T. SEWELL and D. SEWELL exit the 900 W. Gunnison Ave. building and enter the Camry departing westbound. An agent then observed D. SEWELL exit the Camry in the area of Gunnison Ave. and Sheridan Ave. Surveillance units observed T. SEWELL drive south on Lake Shore Drive from Lawrence Ave to Walton Street. At approximately 8:00 PM, an agent observed TREVINO (the female from February 14, 2007) exit the 900 N. Michigan Ave. building walking north across Walton St. An agent observed TREVINO meet with SEWELL on Walton Street and enter the Camry. An agent then observed SEWELL drive the two west on Walton St., then south on Rush St. and then back east on Delaware Pl. An agent then observed the Camry park and turn off the lights in the area of 120 E. Delaware St. At approximately 8:10 PM, an agent observed TREVINO exit the Camry and walk into 120 E. Delaware Pl. Based on the brief nature of meeting, the fact that SEWELL drove the two around the block, then parked and turned his lights off, agents' prior observations of their meeting, and agents' prior interaction with TREVINO, I believe that SEWELL delivered drugs to TREVINO.

52. On March 8, 2007, at approximately 4:00 PM, while conducting surveillance of the Sheridan Shores Condominium Complex, an agent observed RONDELL FREEMAN arrive in a

---

[14] On February 22, 2007, Chicago Police Officers assisting in this investigation conducted a surveillance and observed this same black male exit 1016 W. Hollywood Ave. and enter the passenger side of a Ford Taurus. Officers approached the Taurus to conduct a field interview (and ultimately identified the unknown male as Jonathan DAVIS, DOB: 02/12/1984, IR#1342918, of 1016 W. Hollywood Ave). As officers approached DAVIS, they observed him quickly place his hand in his pocket. Officers then asked DAVIS what he had placed in his pocket, and DAVIS responded that he had "some weed." Officers then recovered four ziplock baggies containing suspect Cannabis from DAVIS. After being *Mirandized*, DAVIS admitted to selling Cannabis.

SW_001_00036

pewter-colored Hummer H2 and park in his assigned parking spot. At approximately 4:55 PM, an agent observed a white Lexus known from previous surveillances to be driven by FREEMAN and his associates arrive at the complex. At approximately 4:58 PM, an agent observed Brian WILBOURN enter the complex.[15] At approximately 5:37 PM, agents observed Terrance SEWELL exit the complex and walk towards the south side of the parking lot. Agents then observed SEWELL's Toyota Camry leave the complex. Surveillance agents were able to follow the Camry to the area of 900 W. Gunnison Ave., where it parked. Agents then observed SEWELL exit the Camry and walk towards the 900 W. Gunnison Ave. building.

### R.  TERRANCE SEWELL'S CRIMINAL HISTORY AND GANGSTER DISCIPLE AFFILIATION

53.  I have reviewed National Crime Information Center, Illinois State Police, and Chicago Police Department criminal history records for TERRANCE SEWELL. My review has disclosed that SEWELL has been arrested approximately 17 times for offenses that include Manufacture/Delivery of a Controlled Substance, Possession of Less than 15 Grams of Cocaine, Manufacture/Delivery of Less than 15 Grams of Cocaine, manufacturer/Delivery of Less than 1 Gram of Cocaine, Possession of Less than 2.5 Grams of Cannabis, Robbery, and Domestic Battery.

54.  I have also conducted a review of conviction records from the Circuit Court of Cook County, Illinois for TERRANCE SEWELL. My review disclosed that SEWELL has one felony conviction for Manufacture/Delivery of Less than 1 Gram of Cocaine from 2003, for which he was

---

[15] CW1 has identified BRIAN WILBOURN as a Gangster Disciples street gang member. WILBOURN has numerous drug-related arrests in Cabrini Green, and has been convicted of two drug felonies. In addition, WILBOURN has been intercepted inside FREEMAN's narcotics packaging house preparing narcotics for resale. Moreover, on April 11, 2006, CPD officers conducted a traffic stop on vehicle in which WILBOURN was the passenger. After being asked to step out of the vehicle, WILBOURN fled from officers and discarded a cellophane-wrapped package that agents recovered and found to contain crack cocaine and heroin.

24

sentenced to 3 years imprisonment.

55. I have also reviewed Illinois Department of Corrections (IDOC) records relating to TERRANCE SEWELL's imprisonment, and those records list SEWELL as a Gangster Disciple street gang member. My review also disclosed that, in April of 2005, SEWELL was paroled to his mother's residence, 4813 N. Winthrop, Unit 3N, Chicago, Illinois, the same residence discussed in paragraph 39.

## V. CONCLUSION

56. Based on the above information, there is probable cause to believe that: (a) TERRANCE SEWELL, RONDELL FREEMAN, SENECCA WILLIAMS, SYBLE MCCLUTCHEY, ADAM SANDERS, ROBERT FREEMAN, BRIAN WILBOURN and other Gangster Disciples street gang members and others are conspiring to distribute narcotics within the city of Chicago; (b) TERRANCE SEWELL uses apartment unit 106, located at 900 W. Gunnison Avenue, Chicago, Illinois; and (c) evidence of violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of cocaine and crack cocaine); Title 21, United States Code, Section 843(b) (use of a communication facility in furtherance of the commission of a controlled substance offense); and Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances as listed in Attachment B) is concealed in

SW_001_00038

TERRANCE SEWELL's apartment described above and in Attachment A to the search warrant.

FURTHER AFFIANT SAYETH NOT

_____
Jeffrey Sisto, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn to before me
this  16th day of March, 2007

_____
Magistrate Judge, United States District Court
Northern District of Illinois

26

Attachment A

Premises to be Searched – 900 W. Gunnison, Unit 106, Chicago, Illinois

900 West Gunnison, Unit 106, Chicago, Illinois, is a 1st floor apartment unit in a multi-unit apartment building, located on the north side of Gunnison Avenue and west of Marine Avenue. The numbers 900 are attached to the building's yellow brick facade and positioned to the right of its south entrance. Unit 106 is located on the 1st floor, and is the furthest unit to the north. The numbers 106 are affixed directly to the outside of the door.

SW_001_00040

Attachment B

Items to be Seized

The items to be seized consist of the following:

(A)   Cocaine, cocaine base, heroin, marijuana or any other illegal drug observed within the premises.

(B)   Drug paraphernalia, including scales, plastic bags, latex gloves, mixing devices and utensils, and cutting agents.

(C)   Books, ledgers, notes, photographs, and other paper records detailing gang membership, gang hierarchy, gang by-laws, gang meetings, gang dues, the amount and types of firearms and narcotics possessed, and the amount of money that the gang has at its disposal.

(D)   Books, ledgers, notes, receipts, lists, and other paper records relating to the transportation, ordering, storage, sale, and distribution of firearms and narcotics.

(E)   Financial books, records, lists, receipts, bank and savings and loan records of deposits, statements, and other bank records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, computer and software records containing financial data and information related to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture.

(F)   Cell phone and pager records, as well as any cell phones and pagers, including the contents thereof.

(G)   Any firearms, ammunition, and weapons-related gear, such as holsters and bullet-proof vests.

(H)   Indicia of ownership, occupancy or residency of the premises being searched or other premises owned, rented, or utilized by SEWELL, including utility and telephone bills, lease agreements, mortgage records, loan documents, service, remodeling and repair contracts.

(I)   United States currency, precious metals, jewelry, and financial instruments.

## PROOF OF SERVICE

    I, _Steven Saltzman_, an attorney hereby certifies that on August 7, 2008 in accordance with the Fed.Crim.P. 49, Fed.R.Civ.P.5 and LR5.5, and the General Order on Electronic Case Filing (ECF), the above stated Exhibit A was served pursuant to the district court's ECF system as to ECF filers.

                             _s/Steven Saltzman_

Steven Saltzman
122 S. Michigan Ave., Ste 1850
Chicago, IL  60603
312-427-4500